IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WANDA D. MORGAN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, Acting ) <br> Commissioner of the U.S. Social ) <br> Security Administration, ) <br> ) <br> Defendant. ) | No. 14 C 6513 <br><br> Magistrate Judge Sidney I. Schenkier |

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, Wanda Morgan ("Ms. Morgan") seeks judicial review under 42 U.S.C. § 405(g) of a final decision of the Defendant, Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI") benefits. We presently consider Ms. Morgan's motion to reverse or remand the Commissioner's decision (doc. # 17), and the Commissioner's motion for summary judgment (doc. # 27). Ms. Morgan has also filed a reply to the Commissioner's motion (doc. # 29). For the reasons that follow, Ms. Morgan's motion for remand is granted. The Commissioner's motion for summary judgment is denied.

I.

We begin with the procedural background of this case. Ms. Morgan filed an application for SSI on February 26, 2010, alleging that she was disabled due to Carpal Tunnel Syndrome ("CTS"), diabetes, high blood pressure, and asthma, with an onset date of October 3, 2002 (R.

---

[1] On September 15, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 8).

186).² Her claim was denied initially on May 25, 2010 and again on reconsideration on September 29, 2010 (R. 72-73). Ms. Morgan requested and was granted a hearing before an Administrative Law Judge ("ALJ"), which took place on March 2, 2012 (R. 34-71, 89-91). On August 28, 2012, the ALJ issued a decision finding Ms. Morgan not disabled and thus not entitled to SSI (R. 17-30). The Appeals Council denied review on September 24, 2013, making the ALJ's decision the final decision of the Commissioner (R. 4-6); *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013).

## A.

We next summarize the medical record. Ms. Morgan was born on May 13, 1961; she was 50 years old at the time of her hearing. On September 13, 2009, Ms. Morgan visited the Adventist Bolingbrook Hospital emergency room complaining of shortness of breath caused by asthma (R. 251-69). The attending physician noted that Ms. Morgan's lungs were clear and that a chest x-ray was normal (R. 257). She was discharged the same day with a prescription for the inhaled medication Albuterol; the discharge notes state "lungs clear, feels well" (R. 254-257).

Outside of the visit to the Bolingbrook Hospital emergency room, the majority of Ms. Morgan's medical treatment was provided by the Will County Community Health Center ("Will County"); she visited there twelve times between July 2009 and December 2010. Most of Ms. Morgan's visits to Will County related to obtaining prescription refills for her asthma and hypertension medications as well as follow up appointments after her October 2009 diabetes diagnosis (R. 276-281). In February 2010, a doctor at Will County recommended that Ms.

---

² Although Ms. Morgan states in her SSI application that her onset date for her disability is October 3, 2002 (R. 162), the medical record begins in 2009 and at the hearing, the parties agreed to consider whether she had performed substantial gainful activity as of her application date in February 2010, instead of her alleged onset date (R. 59). Ms. Morgan does not argue that the ALJ erroneously failed to obtain or consider any earlier medical records.

Morgan undergo a bilateral MRI of her hands and wrists (R. 275).³ The record does not reflect that Ms. Morgan had an MRI; instead, an x-ray taken in March 2010 was judged "unremarkable" (R. 351). A treatment note from an April 2010 follow up appointment diagnosed Ms. Morgan with CTS (the first time this diagnosis was noted by Will County), and also stated that Ms. Morgan's right wrist was mildly swollen (R. 274). Ms. Morgan was prescribed the pain reliever Tramodol at this appointment (*Id.*). Ms. Morgan next visited Will County in May 2010, in part to obtain test results related to her diabetes. This treatment note also states that Ms. Morgan "did not have EMG done" (R. 302).⁴

On May 17, 2010, Agency physician Dr. Ravikiran Tamragouri examined Ms. Morgan in connection with her application for benefits (R. 286-88). He noted that Ms. Morgan took the medication Metformin for diabetes, was watching her diet to control her high blood pressure, and used an inhaler to control her asthma (*Id.*). With respect to Ms. Morgan's hands, wrists, and arms, Dr. Tamragouri noted that Ms. Morgan complained of CTS bilaterally and tendonitis in her right shoulder, and alleged that she continued to experience CTS symptoms, despite her having surgery in 2002 (R. 286, 288). On examination, Dr. Tamragouri noted that Ms. Morgan's range of motion for all joints was normal and there were no joint swellings, deformities, or tenderness (R. 287). Dr. Tamragouri further noted that Ms. Morgan's grip strength was 4/5 on her right hand and 5/5 on her left hand (*Id*). When tested, she reported decreased touch sense in her fingers, more in her right hand than her left hand (*Id.*). Ms. Morgan "performed alternating movements of

---

³The treatment notes from this visit, like those for all of Ms. Morgan's visits to Will County, are indecipherable in parts. There is a notation that appears to state that Ms. Morgan complained she sustained an injury and another that judges her range of motion as within normal limits, but it is not evident what type of injury Ms. Morgan sustained or what treatment was indicated for it.

⁴EMG refers to "Electromyography" and is a test used to diagnose CTS. http://www.mayoclinic.org/diseases-conditions/carpal-tunnel-syndrome/basics/tests-diagnosis/con-20030332 (visited on May 11, 2016). The record does not reveal when it was recommended that Ms. Morgan undergo an EMG.

3

her hands normally and without pain" (*Id*). In addition, "she [was] able to touch her fingers to the thumbs without difficulty" and "performed fine and gross hand movements normally" (*Id*).

On May 21, 2010, Dr. Francis Vincent completed a physical Residual Functional Capacity ("RFC") assessment of Ms. Morgan, based on Dr. Tamragouri's examination (R. 290-97). Dr. Vincent opined that Ms. Morgan could occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds (R. 291).[5] He judged that Ms. Morgan could stand, sit, or walk for a total of six hours in an eight-hour workday and was unlimited in her ability to push or pull (*Id*). Dr. Vincent recognized that Ms. Morgan had reduced grip strength in her right hand and decreased sensation to touch in her fingers, but noted that her fine and gross manipulations were intact (*Id*). Furthermore, he did not note any manipulative limitations in his assessment (R. 293). Dr. Vincent concluded that although Ms. Morgan's impairments could be expected to produce some limitation in function, "the extent of the limitations described by the claimant in terms of having problems…using her hands, exceeds that supported by the objective medical findings" (R. 297). Dr. Richard Bilinski affirmed Dr. Vincent's findings on September 27, 2010 (R. 306-7).

In September 2010, Ms. Morgan visited Will County for a follow up on her diabetes condition; in addition, this visit marks the first recorded evidence of Ms. Morgan complaining of knee pain (R. 330). She had an x-ray of her knees in October 2010 that revealed mild arthritic changes (R. 349); in December 2010, Ms. Morgan visited Will County to request stronger pain medication for her knees (R. 329). The examining doctor added a prescription for the pain reliever Vicoprofen to the Tramadol Ms. Morgan was already taking (*Id.*).

---

[5] These lifting and standing/walking limitations equate to a finding that Ms. Morgan was able to perform work at the medium exertion level. https://www.ssa.gov/OP_Home/cfr20/404/404-1567.htm (visited on May 16, 2016).

4

The record contains no evidence that Ms. Morgan received any medical treatment at all in 2011. In January 2012, she returned to Will County for a checkup; the "assessment plan" from this visit discussed continuing her asthma medications, her need for bloodwork related to her diabetes and high cholesterol, and that she was taking Vicopofen for her arthritis in her knees (R. 322). There was a recommendation that Ms. Morgan exercise and continue to take medication for her arthritis; there is no mention of CTS or pain in her hands or wrists (*Id.*).

**B.**

The ALJ held a hearing on March 2, 2012. At the hearing, Ms. Morgan testified that she has not worked since August 2004, when she worked for Trinity Services providing cleaning, cooking and physical assistance to disabled individuals (R. 39). Prior to that time, Ms. Morgan worked at Meijer Stores as a cashier (R. 40). Ms. Morgan testified that was injured in October 2002 when a box of oil fell on her hand (R. 40-41).[6] Ms. Morgan received Worker's Compensation for her injury and tried to return to her cashier's job, but testified that she was terminated because she could not lift heavy groceries and other items (R. 41-42).

Ms. Morgan testified that she had surgeries in 2002 and 2003 on both of her hands, but the surgery did not improve her CTS (R. 43). With regard to her asthma, Ms. Morgan testified that she was taking Advair and Pro-Air to alleviate her asthmatic symptoms (R. 44). She further testified that her doctor prescribed "little steroid pills" to help restore her breathing (*Id*). Ms. Morgan treats her diabetes with medication but she testified that it does not help keep her sugar levels under control (R. 45). She testified that she requires juice or candy about ten to twelve times a day in order to ensure her blood sugar levels do not drop (R. 51). Ms. Morgan testified that she does not have any side effects from her medication (R. 47).

---

[6] Although the medical record is not explicit on the issue, the parties appear to agree that Ms. Morgan's injury caused her CTS.

5

Ms. Morgan testified that because of her CTS, she feels a lot of aching pain throughout her hand joints (R. 47). She described the pain as a "numbness, like pin sticking, and then there's a real sharp like knife piercing pain" (R. 48). Ms. Morgan testified that her thumbs will lock up at least two or three times a week, and that her left hand is slightly better than her right hand but it is still weak (R. 47, 51). Ms. Morgan testified that she can lift around five pounds with each hand (R. 47-48). In addition to her CTS, Ms. Morgan stated she has arthritis in both knees and it has been a problem for more than a year and a half; she testified that on certain mornings she cannot straighten her legs (R. 48).

Ms. Morgan testified that her typical daily activities include reading the Bible and praying, as well as taking care of her adult son with Downs Syndrome and performing some housework with the help of her daughter; both her son and daughter live with her (R. 50). In a March 2010 function report that she completed as part of her application for benefits, Ms. Morgan reported that she could do a load of laundry on the days she was feeling well, that she prepared food twice a week, and that she needed assistance doing her hair and dressing because it hurt to lift her hands over her head (R. 196). Ms. Morgan has not been able to get a medical card despite numerous applications because, she says, she has not been "legally diagnosed disabled," although she was able to have dental work performed at Will County (R. 54).

A Vocational Expert ("VE") testified that Ms. Morgan's previous jobs at Trinity Health Services and Meijer were at the light, semi-skilled level (R. 56). The ALJ asked the VE to consider a hypothetical individual who can lift and carry twenty pounds occasionally, ten pounds frequently, can stand, walk, and sit for six hours out of the eight-hour workday, can frequently handle and finger with both hands, cannot be exposed to concentrated pulmonary irritants, and should not work with hazardous machines (R. 58-59). The VE opined that such an individual

would be able to perform Ms. Morgan's previous duties of unskilled cashier at the light level, as well as at least sixty percent of available maid or house-keeping positions, as those are also unskilled and light exertion jobs (*Id*). Ms. Morgan could also perform the duties of a non-postal service mail sorter or mailroom clerk, another unskilled position considered to be at a light exertion level (R. 60).

## C.

On August 28, 2012, the ALJ issued a written decision denying Ms. Morgan's application for SSI benefits (R. 17-30). At Step One of the sequential evaluation, the ALJ found that Ms. Morgan has not engaged in substantial gainful activity ("SGA") since her SSI application date of February 26, 2010 (R. 22). At Step Two, the ALJ found that Ms. Morgan's severe impairments were diabetes, arthritis,[7] CTS, and obesity (*Id*). At Step Three, the ALJ determined that Ms. Morgan did not have an impairment or a combination of impairments that meet or equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1 (R. 23).[8]

Before moving to Step Four, the ALJ found that Ms. Morgan had an RFC that matched the hypothetical she gave the VE, that is, Ms. Morgan could perform light work, except that she can lift or carry twenty pounds occasionally and ten pounds frequently, can stand, walk, or sit for six hours in an eight-hour workday, and can frequently handle and finger (R. 24). The ALJ also established further limitations in the RFC: avoiding concentrated exposure to pulmonary

---

[7] In her opinion, the ALJ does not specify that Ms. Morgan's arthritis was localized to her knees, but the medical record does not show that Ms. Morgan complained of, or was diagnosed with arthritis in any place other than her knees.

[8] The ALJ discussed Ms. Morgan's obesity in her Step Three analysis, explaining that, although obesity may have an adverse impact upon co-existing impairments, "there is no indication that the claimant's obesity, alone or in combination with any other impairment, has given rise to a condition of a listing-level severity" (R. 23). The ALJ notes that plaintiff did not complain that her obesity affected her ability to work, had no trouble with mobility, and did not use an assistive device to walk (*Id.*). Although the ALJ addressed obesity as part of her Step Three analysis only, her finding that Ms. Morgan's obesity does not cause any limitations (and the lack of mention of obesity in the medical record at all) is relevant to her determination that Ms. Morgan's obesity does not affect her ability to work.

irritants, working directly with hazardous machines, and working in high-exposed places (*Id*). In support of the RFC, the ALJ explained that she considered Ms. Morgan's symptoms, and the extent to which those symptoms were consistent with the objective medical evidence and other evidence, as well as the medical opinions in the record (R. 24). After detailing both the subjective and objective evidence, the ALJ explained that, although she gave Ms. Morgan's testimony some weight, "the mostly normal clinical findings, mild diagnostic findings and minimal complaints in the treatment record with consistent medication management did not support a finding of total disability" (R. 27).[9]

Specifically, in explaining her RFC determination and finding that Ms. Morgan retained the ability to work, the ALJ pointed to: (1) Ms. Morgan's various daily activities (driving, preparing simple meals, taking care of her adult son with Downs Syndrome, taking her grandchildren to the park); (2) the fact that she returned to her cashier's job after her 2002 CTS surgery; (3) the infrequency of her asthma attacks, and successful management of the condition with medication; (4) the "relative stability" of her symptoms for all her impairments with medication, without side effects; (5) her minimal complaints of pain or documentation of problems with her right hand; (6) the fact that her medical treatment for her various conditions was periodic and sporadic; and (7) essentially normal physical examinations and diagnostic tests (R. 25). In addition, the ALJ also considered the entirety of Ms. Morgan's treatment at Will County and determined that many of her treatments were not related to aggravated chronic

---

[9] The ALJ's opinion also included the oft-cited boilerplate language "I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 27). As we explain below, the use of this language is harmless because the ALJ bolstered this boilerplate statement with specific reasons and citations to the record about why she found that plaintiff was not entirely credible with respect to the severity of her alleged symptoms. *Loveless v. Colvin,* 810 F.3d 502, 507-8 (7th Cir. 2016).

symptoms but were visits to seek help for medication refills, to obtain lab results, or to complete necessary paperwork (R. 24-25).

In addition, the ALJ stated that she also considered the opinion of the state agency medical consultant, and gave it some weight (R. 28). The ALJ found the opinion of Dr. Vincent, and confirmation by Dr. Bilinsky, that Ms. Morgan could perform medium work to be "reasonable" in light of the minimal treatment and clinical findings (*Id*). The ALJ discussed Dr. Tamragouri's examination of Ms. Morgan, first recognizing that, "notably, she [Ms. Morgan] failed to report any ongoing medications for pain" (R. 26).[10] The ALJ discussed that Dr. Tamragouri's examination of Ms. Morgan revealed normal coordination, reflexes, fine motor skills and range of motion (R. 26). She noted the doctor's assessment that Ms. Morgan had "mild reduced strength" in her right hand but found that the grip strength reduction did not support Ms. Morgan's allegations about more severe problems with her right hand (*Id.*).

With respect to Ms. Morgan's complaints of arthritis in her knees, the ALJ noted that Ms. Morgan first began complaining of problems with her knees in September 2010, and that she refused a referral for occupational therapy. The ALJ also noted that Ms. Morgan's knee x-ray revealed mild arthritic changes and that Ms. Morgan returned to Will County in December 2010 for stronger pain medication for her knees, but did not follow up on any of her medical treatments until January 2012.

The ALJ stated that despite a lack of support in the objective medical evidence, she nevertheless relied on Ms. Morgan's subjective complaints of pain from arthritis and CTS to reduce her RFC from the medium level recommended by Dr. Vincent to the light work level (*Id*).

---

[10]Although in his examination report, Dr. Tamragouri lists seven medications that Ms. Morgan reported taking (Metformin and Glimepiride for diabetes, Albuterol, Advair and Rhinocort for asthma, Crestor for high cholesterol, and an Omega 3 vitamin), none of them are pain medications (R. 286). We cannot determine from the record whether Ms. Morgan informed Dr. Tamragouri that she had been prescribed the pain medicaion Tramadol for her CTS one month earlier.

9

The ALJ further stated that the reduced exertional level and additional environmental limitations took into consideration Ms. Morgan's obesity and asthma, despite the fact that the record provided no proof of frequent asthma exacerbations (*Id*).

With respect to Ms. Morgan's credibility, the ALJ recognized that some of Ms. Morgan's failure to obtain treatment may have stemmed from an inability to afford particular tests or medical specialists (R. 26). After acknowledging Ms. Morgan's financial difficulties, the ALJ determined that, in any event, Ms. Morgan was not taking significant medications for her pain and alleged limitations (*Id*). Moreover, the ALJ found that despite Ms. Morgan's inability to afford additional CTS testing or a pain specialist, the overall record suggested that Ms. Morgan rarely visited Will County for pain management, although she went there regularly for other medication refills, paperwork assistance, and follow-up tests for her diabetes (R. 25, 27).

At Step Four, the ALJ concluded that Ms. Morgan has never engaged in SGA and therefore does not have past relevant work (*Id*).[11] At Step Five, the ALJ determined that Ms. Morgan retains the RFC to perform the job requirements of a housekeeper cleaner, mail sorter, and cashier (R. 29).

## II.

We review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (internal citations omitted). We do not reweigh evidence or substitute our own judgment for that of the ALJ. *Shideler v. Astrue*, 688 F.3d 306,

---

[11]The ALJ does not reconcile this finding with Ms. Morgan's hearing testimony about her previous jobs at Meijer and Trinity, but it is true that Ms. Morgan did not perform any SGA after 2004, even though she did not apply for benefits until 2010.

10

310 (7th Cir. 2012). In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Pepper v. Colvin*, 712 F.3d 351, 361 (7th Cir. 2013).

Ms. Morgan argues that the ALJ failed to properly consider her hand limitations stemming from her CTS, that the ALJ's adverse credibility determination was flawed, and that the RFC was unsupported by substantial evidence in the record because the ALJ rejected the only medical opinion in the record (Pl. Mot. at 6-15). We disagree with many of plaintiff's arguments. For example, plaintiff argues that because the only medical opinion in the record (Dr. Vincent's) assessed Ms. Morgan as having a "medium" RFC, by giving Ms. Morgan an RFC that was "light" with additional restrictions, the ALJ rejected Dr. Vincent's opinion outright and then independently – and impermissibly – "played doctor" by determining Ms. Morgan's RFC herself (Pl. Mem. at 7-8).[12] This is incorrect; the ALJ explicitly states in her decision that Dr. Vincent's opinion (and Dr. Bilinski's affirmance of it) were "reasonable," and gave them "some weight" (R. 28). The ALJ has the responsibility of resolving any conflicts between the medical evidence and the claimant's testimony. *See Shauger v. Astrue,* 675 F.3d 690, 698 (7th Cir.2012) (quoting *Hacker v. Barnhart,* 459 F.3d 934, 936 (8th Cir.2006)). Thus, it was well within the ALJ's authority to consider and then reduce Dr. Vincent's suggested RFC of medium to the light level, as long as she adequately supported her decision and built a logical bridge from the evidence to her decision.

The bulk of the ALJ's opinion allows us to trace her reasoning from the medical opinions to her RFC determination. With respect to Ms. Morgan's hand limitations, the ALJ noted that Dr.

---

[12] Ms. Morgan did not have a treating physician as defined by the regulations, *see* 20 C.F.R. § 404.1502. Therefore, the ALJ reasonably considered Dr. Vincent's RFC assessment to determine what skills and functions Ms. Morgan could perform. *See, Young v. Barnhart,* 362 F.3d 995, 1001-02 (7th Cir. 2004) (absent treating opinion, ALJ was entitled to consider all non-treating opinions and determine which were worthy of the most weight).

11

Vincent opined that plaintiff was able to lift 25 pounds frequently and 50 pounds occasionally and did not include any manipulative limitations. She compared this to plaintiff's testimony that she was able to lift only five to eight pounds and that she dropped things, and found that the record did not support Ms. Morgan's claim because the "mild diagnostic findings and minimal complaints in the treatment record with consistent medication management" were inconsistent with the plaintiff's alleged lifting abilities.[13] However, despite the lack of support in the medical record, the ALJ considered Ms. Morgan's subjective complaints of pain with arthritis and CTS to support a reduction in her RFC (R. 27).[14] With respect to limitations based on Ms. Morgan's CTS, the ALJ sufficiently explained why she reduced Dr. Vincent's RFC. *Henke v. Astrue*, 498 Fed.Appx. 636, 641 (7th Cir. 2012) (lack of perfect explanation by ALJ for reducing RFC to light level harmless error, particularly where plaintiff stood to benefit from decision). *See also, Reed v. Colvin*, 2:12-CV-331, 2013 WL 4584553 at *7 (N.D.Ind., August 28, 2013) (finding that it logically follows that if plaintiff could perform the more involved tasks set forth in the doctors' opinions, she could also perform the easier tasks set forth in the RFC).

---

[13] Contrary to Ms. Morgan's argument, the ALJ reasonably justified her decision to find that Ms. Morgan retained the ability to finger and handle frequently. Plaintiff argues that the ALJ erred by characterizing Ms. Morgan's 4/5 right-handed grip strength and sensory loss in her fingertips as "minimal" because this was an "unsupported independent medical judgment" (Pl. Mem. at 7). But Dr. Vincent recognized these very issues (as found by Dr. Tamragouri) in his RFC assessment, and the ALJ relied on Dr. Vincent's RFC when creating her own. Therefore, the ALJ did not make an independent medical judgment, but instead summarized medical records and opinion and drew a conclusion from them. *Olsen v. Colvin*, 551 Fed.Appx. 868, 875 (7th Cir. 2014). Furthermore, not only did Dr. Vincent determine that Ms. Morgan had no manipulative (fingering and handling) limitations, but Dr. Tamragouri's examination of Ms. Morgan revealed that she was able to fully perform fine and gross motor manipulations without pain. Ms. Morgan also contends that the ALJ "did not assess evidence of wrist or finger swelling" (Pl. Mot. at 8), but we note that the sole mention of swelling was made in an April 2010 treatment note from Will County; Dr. Tamragouri's examination of Ms. Morgan, which occurred less than a month later and on which the ALJ relies, revealed no swelling in any extremity.

[14] While we find that the ALJ otherwise supported her determination that Ms. Morgan had the ability to handle and finger, we agree that the ALJ should not have supported her finding with evidence that Ms. Morgan worked as a cashier after her hand surgery in 2002 and 2003 (R. 24), given that Ms. Morgan testified that she was fired from the cashier position due to an inability to perform her work. *See, e.g., Banks v. Barnhart*, No. 02-3339, 2003 WL 1961830 at *5 (7th Cir. April 23, 2003) (ALJ erred in relying solely on claimant's ability to return to work after accident, particularly where substantial evidence supported finding of disability).

However, we cannot say the same with respect to limitations based on Ms. Morgan's knee condition. We remand because the medical opinions on which the ALJ relied for her RFC determination were rendered before Ms. Morgan was diagnosed with arthritis in her knees, and the ALJ failed to explain the path by which she determined the evidence shows that Ms. Morgan could perform light duty work. Dr. Vincent's medical opinion, and Dr. Tamragouri's examination on which Dr. Vincent's opinion is based, both predate Ms. Morgan's diagnosis of arthritis in her knees, which the ALJ found was a severe impairment. Both the medium and light exertion levels assume the ability to stand or walk for six hours in an eight hour work day. https://www.ssa.gov/OP_Home/cfr20/404/404-1567.htm (visited on May 16, 2016). The ALJ did not explain how this adjustment from the medium exertion level (as found by Dr. Vincent) to light, which does not diminish the standing and walking level of exertion, accounted for any limitations that might be warranted based on Ms. Morgan's knee condition. We do not know whether any are in fact warranted. But, the ALJ could not rely on the Tamragouri and Vincent opinions in determining that Ms. Morgan can stand or walk for six hours a day, despite her arthritis.

We find that the ALJ here has not built an "accurate and logical bridge" from the evidence about Ms. Morgan's knee condition to the RFC determination that she could perform at the light exertion level. While the medical records concerning Ms. Morgan's other impairments reveal that they were well-controlled by medication and that she seldom complained of pain in her hands and wrists, the medical record is less clear with respect to Ms. Morgan's knees. Her arthritis was diagnosed through x-ray and the record suggests that pain medication may not have been sufficient to control her symptoms. We note that the ALJ partially discredited Ms. Morgan's complaints of pain because of her gaps in treatment and the fact that she rarely

requested pain medication (R. 25, 27). However, we read this analysis as being more targeted towards Ms. Morgan's CTS than to her arthritis. Although the record does not support a finding that Ms. Morgan sought additional medication for her hands, it does show her returning to Will County for better pain control for her knees in late 2010 and then again in early 2012.[15]

In remanding this case, we are mindful that in *Trammell v. Colvin*, 12 C 6780, 2014 WL 1227565 at *7, (N.D.Ill. March 25, 2014), the district court declined to remand for an additional medical opinion concerning a diagnosis rendered after the date of the medical expert's RFC. But in that case, the ALJ considered a number of more recent test results "at length," including several doctors' evaluations of the plaintiff's impairment, and there was no indication that the RFC was contradicted by the more recent diagnoses. *Trammell*, 2014 WL 1227565 at *6. In contrast, the record here contains notes of Ms. Morgan's complaints of knee pain and diagnostic test results, but no medical analysis of the limitations (if any) resulting from that condition. Further, the ALJ did not describe how she determined that Ms. Morgan was able to stand and walk for up to six hours a day, given that the ALJ found Ms. Morgan's knee impairment to be severe. The ALJ's treatment of Ms. Morgan's arthritis does not meet the Seventh Circuit's standards for a "logical bridge" from the evidence to her RFC.

---

[15]Ms. Morgan explained that her gap in treatment was due to her inability to afford a pain specialist and also because she tried – but ultimately failed because of pain – to follow the recommendation of a Will County doctor that she exercise. Plaintiff argues that the ALJ failed to properly explore the reasons for the gaps in Ms. Morgan's treatment before using making a negative inference about plaintiff's credibility concerning her pain. *Shauger v. Astrue*, 675 F. 3d 690, 696 (7th Cir. 2012). We need not address Ms. Morgan's arguments about credibility here, but trust that on remand, the ALJ will fully explore Ms. Morgan's reasons for her gaps in treatment.

## CONCLUSION

For the foregoing reasons, Ms. Morgan's motion (doc. # 17) is granted. The Commissioner's motion for summary judgment (doc. # 27) is denied. This case is remanded for further consideration consistent with this opinion.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: June 9, 2016**